**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JEFFREY R. KINDLE, | |
| Plaintiff, | |
| v. | Civil Action No.:  SAG-22-2763 |
| LT. JEREMY CRITES,<br>LT. WALTER ISER,<br>C.O. JOHN LEASE,<br>C.O. ROGER GROWDEN, | |
| Defendants. | |

**MEMORANDUM OPINION**

Pending in this civil rights case are motions filed by *pro se* Plaintiff Jeffrey R. Kindle for leave to file an amended complaint[1], ECF 23, for extension of time and injunctive relief, ECF 35, for access to court, ECF 36, and for permission to file new evidence, ECF 44.  Defendants Lt. Jeremy Crites, Lt. Walter Iser, Officer John Lease, and Officer Roger Growden have filed a Motion to Dismiss, or in the alternative, for Summary Judgment, ECF 29, and a Motion to Seal two exhibits, ECF 30.  No hearing is required to resolve the pending matters.  *See* Local Rule 105.6 (D. Md. 2023).

For the reasons that follow, Defendants' motion, treated as a motion to dismiss, shall be DENIED in part and GRANTED in part.  The remaining non-dispositive motions are addressed individually below.

---

[1]     On April 12, 2023, this Court issued an Order directing the Clerk to designate ECF 24 and 25 as the amended complaint and directing that the two filings be consolidated into one amended complaint on the docket.  ECF 27.  The motion to amend the complaint shall therefore be denied as moot.

# I.      BACKGROUND

## A.      Amended Complaint Allegations

At all times relevant to the Amended Complaint, Kindle was incarcerated at North Branch Correctional Institution ("NBCI") on the "Max II Unit."  ECF 28 at 11.  According to Kindle's verified Amended Complaint, the Max II Unit "houses some of the most dangerous inmates in the Maryland prison system."  *Id*.  He explains that inmates with "institutional murder charges, rapists, and violent assaults on staff as well as escape risks are housed on Max II."  *Id*.  Further, Kindle states that Max II is "also a gang segregation unit that has special policies and procedures in place to keep certain groups of inmates separated from each other to prevent violent attacks and murders on the unit."  *Id*. at 12. Staff members assigned to Max II receive special training to keep the housing unit safe. *Id*.

According to Kindle, correctional staff are supposed to keep the "security threat groups or gangs isolated so that they never have physical contact with other people." ECF 28 at 12. Kindle states that the unit is designed so that groups of approximately four to eight cells of inmates from the same security threat group are put into the same "rec set." *Id*. When one rec set is let out of their cells, there is to be no other rec set let out at the same time until that rec set is secured in their assigned cells. *Id*. at 12-13. This policy keeps people from being attacked by other inmates. *Id*. at 13. Nevertheless, Kindle states that Max II remains a violent place despite the policies in place. *Id*. He claims that there "are still frequent assaults on both inmates and staff and there have been murders and rapes as well." *Id*.

Kindle has observed that certain groups of correctional officers create conditions where "known enemies are 'accidentally' made to come into contact" with one another. ECF 28 at 13. He asserts that "these officers enjoy re-watching the violent confrontations on surveillance video

like they're watching reality television." *Id*. He claims that certain officers have spoken about what they saw on the video, discuss which inmate got the better of another, and treat the events as if they had occurred in a "fight club." *Id*.

Kindle believes the Bloods gang had issued an order for a "hit" on him and he states this "rumor of the hit was common knowledge on the Max II unit." *Id*. at 14. Kindle suggests that Defendant Officer John Lease had knowledge of the Bloods' intent to kill him. *Id*.

On June 4, 2021, at approximately 12:50 p.m., Kindle was in his cell (D-51) with his cellmate Terry John Croft watching television. ECF 28 at 14-15. There were members of the Bloods gang out on the tier sweeping and mopping. *Id*. at 15. One member of the Bloods, Jose Vasquez, was locked in his cell. *Id*. Officer Lease was in the C-D Control room supervising the Max II Unit and Defendant Roger Growden was in the hallway. *Id*. At 12:55 p.m., Officer Lease announced that cell D-51, Kindle's cell, should get ready to go out on a sick call. *Id*. at 15-16. Lease did not state which inmate, Kindle or Croft, was scheduled to go out. *Id*. Whereupon Vasquez shouted out to his fellow Bloods to "try to get him out of his cell to help them clean, even though he was not scheduled to work." *Id*. at 16. The workers on the tier asked Growden to let Vasquez out of his cell and Growden called the control room to have Vasquez released from his cell. *Id*. Kindle implies that Vasquez's request was a ruse. *Id*. at 17.

Vasquez exited his cell with a concealed shank on his person and began talking to his fellow gang members. ECF 28 at 17. According to Kindle, Lease was supposed to have the inmates who were cleaning the tier secured in the shower stalls before opening any other cell door, but instead he ignored that procedure and opened Kindle's cell door. *Id*. at 17-18. Kindle's cellmate was told he had a sick call appointment, so he exited the cell to go to the medical room. *Id*. at 18.

3

Kindle claims that Lease's violation of the procedure gave Vasquez and the other Blood members the message that Lease did not care about what happens. *Id.* at 18.

Vasquez and Robert Matthews, who was also a member of the Bloods, went upstairs and laid in wait at Kindle's cell door while brandishing weapons. ECF 28 at 18. When Croft returned from his medical appointment, Lease opened the door to cell D-51. *Id.* at 18-19. Vasquez and Matthews then rushed into the cell, knocked Kindle to the bed where he lost consciousness, and proceeded to stab him a total of 25 times in the head, face, neck, chest, arms, hand, back, spine, and his left side. *Id.* at 19. The wound to Kindle's left side severed the tenth and eleventh ribs and caused his chest to fill with blood. *Id.*

Kindle maintains that Lease witnessed Vasquez and Matthews "fight their way into [his] cell" but again violated policy by not "calling a 10-10 code for assistance." ECF 28 at 19-20. Instead, Kindle claims Lease "chose to casually call [Growden] on the telephone and tell him that there was suspicious activity upstairs" but did not mention the cell number. *Id.* at 20. Lease's failure to call a code 10-10 provided enough time for Vasquez and Matthews to attempt to kill Kindle. *Id.*

When Growden climbed the stairs and made it halfway down the tier toward Kindle's cell, someone yelled to Vasquez and Matthews that "the cops are coming." ECF 28 at 20. Vasquez and Matthews exited Kindle's cell where he was left covered in blood. *Id.* Growden ordered Vasquez and Matthews to drop their weapons and get on the floor, which they did. *Id.* When Growden looked into Kindle's cell and saw the extent of his injuries he immediately called a 10-10 code for assistance and medical. *Id.* When assistance arrived, Vasquez and Matthews were handcuffed and removed from the unit. *Id.* at 21.

4

Kindle attempted to stand up but quickly dropped to the floor due to extreme blood loss. ECF 28 at 21. He describes the stab wound to his left side as "spraying and squirting massive amounts of blood every time [his] heart beat." *Id*. Kindle explains that the "adrenalin[e] rush only made [him] bleed out faster." *Id*. The officers who had responded to the area were afraid to touch Kindle. *Id*. Kindle claims that Officer Adkins, "repeatedly used his radio to tell . . . Lease to call 911." *Id*. Kindle's understanding is that Lease neglected to call 911 after several officers and Nurse Jacob told him to do so, but at the time nobody knew that Lease had not made the call. *Id*.

Kindle was taken to the medical room with the assistance of the officers and the nurse. ECF 28 at 21. Once in the medical room, Kindle recalls that Nurse Jacob attempted to apply pressure dressing to the worst of his wounds. *Id*. Kindle also recalls losing consciousness several times and that Nurse Brittany Baker had to wake him up repeatedly. *Id*.

Kindle states that after "several minutes" Nurse Erica Alexis asked Defendant Lt. Jeremy Crites if "anyone bothered to call 911" and Crites answered, "not that I know of." ECF 28 at 22. The nurse then called 911. *Id*. Kindle's chest filled with blood, making it difficult to breathe so the nurse put an oxygen mask on him. *Id*. He claims the medical supervisor and Nurse Practitioner Holly Hoover stood by and did nothing to treat his injuries. *Id*. He recalls Hoover standing in the room with her hand over her mouth as if she was in shock. *Id*. Kindle was transported by ambulance to the "University of Pennsylvania Medical Center for Wester[n] Maryland." *Id*.

Kindle remained in the hospital for four and one-half days. ECF 28 at 27. He recalls having nightmares and flashbacks regarding the attack and describes being covered with bruises, hematomas over his severed ribs, and having staples and stitches all over his body. *Id*. Kindle was discharged from the hospital and sent back to Western Correctional Institution ("WCI") where he remained for three days in "a cold lonely isolation cell." *Id*. When he arrived at WCI, all pain

medications were stopped even though Kindle remained "in agony." *Id*. Kindle convinced the doctor to allow him to return to NBCI. *Id*.

Although Kindle had been informed that his security status had changed and that he would be assigned to administrative segregation, he was instead placed back in Max II in the same "blood smeared cell he was attacked in." ECF 28 at 28. According to Kindle, the "clean up crew missed most of the blood under the bed" which now had festered. *Id*. Kindle was considered to be administrative segregation status despite being housed in Max II. *Id*. This meant that each time he came out of his cell he had to be cuffed behind his back while the "same group of inmates who wanted him dead were uncuffed and free to move about." *Id*. Kindle states that administrative segregation is normally housed in Building 1, not the Max II unit. *Id*. He remained in the same cell for more than a month; he was not given recreation time and received no medical treatment. *Id*. Kindle recalls that he had to remove his own stitches and staples and still fears another assault. *Id*.

Kindle claims he still does not receive anything for pain or for the damage to the nerve injured during the assault. ECF 28 at 29. He believes that the "administration" has instructed medical staff not to provide him with treatment. *Id*.

In the aftermath of Kindle's assault, he claims that Crites and Lt. Walter Iser, Jr. wrote a false disciplinary report against him which was signed by Growden. ECF 28 at 32, 36. Among the falsehoods and omissions, the report downplays the seriousness of the incident, does not mention the presence of weapons, and made it seem that Kindle only got beaten up. *Id*.

On September 24, 2021, after Kindle was transferred to Building 1 where other administrative segregation inmates are housed, he claims that Vasquez and another Blood member were moved into the cell next to his. ECF 28 at 27-28. Kindle states it became obvious to both

Vasquez and him that they were "being set up to finish each other off." *Id*. at 28.  Kindle assumed, given his injured state, that it would be he who would be killed in another altercation if it occurred. *Id*.  He remained in the cell next to Vasquez for several months.  *Id*.  These circumstances caused Kindle a "non-stop cycle of pain and fear, never knowing when death will come for him."  *Id*.  He states he has been diagnosed with Post Traumatic Stress Disorder ("PTSD").  *Id*.

Kindle asserts that Crites and Iser are supervisors charged with the responsibility of ensuring staff are properly trained to work on the Max II unit. ECF 28 at 26. He further claims that Crites and Iser attempted to cover-up the wrongdoing that led to Kindle's assault and knowingly wrote a false report.  *Id*.  He additionally claims that all of the named defendants violated his Eighth Amendment rights. *Id*.  Kindle also alleges that Crites failed to call 911 after Adkins and Nurse Jacob asked for it, placing Kindle in greater danger of bleeding to death.  *Id*. at 31-32.

Kindle alleges that Lt. Iser failed to supervise Lease and, in doing so, permitted Lease to "deviate from and ignore several safety and security procedures" which created dangerous circumstances that permitted the assault on Kindle.  ECF 28 at 37.  Kindle adds that Lease's failure to call a 10-10 code to stop the assault and to call 911 to secure emergency medical assistance for Kindle represents a failure to properly supervise by Iser.  *Id*.

With regard to Lease, Kindle alleges that he violated a duty to prevent harm to him at the hands of other prisoners, despite his specialized training on how and when to open and close cell doors.  ECF 28 at 40.  Kindle states that Lease was trained on how to distinguish one group of inmates from another and knew that all of the inmates on the sanitation crew were members of the Bloods gang.  *Id*.  According to Kindle, Lease broke several protocols and violated several safety and security procedures when he opened the door to Kindle's cell twice, despite the presence of gang members on the tier who happened to be armed.  *Id*. at 40-41.  Lease knew he should have

secured the sanitation crew in the shower cells prior to opening any cell door on the unit.  *Id*. at 41.  Further, Lease allowed Vasquez to come out onto the tier when he was not assigned to work with his fellow gang members.  *Id*.  Lease failed to call a 10-10 code for assistance when two assailants fought their way into Kindle's cell and instead used the phone to call another officer. *Id*.  Additionally, Lease failed to call 911 as requested by both Officer Adkins and a nurse who was on the scene.  *Id*. at 42.

With regard to Defendant Roger Growden, Kindle asserts that he was responsible for the safety and security of the Max II Unit.  ECF 28 at 46.  Growden violated the duty he owed Kindle by allowing Vasquez to exit his cell and by failing to stop Lease from opening cell doors when the sanitation crew was not first secured in the shower cells prior to opening the cell door.  *Id*.

As relief, Kindle seeks an award of compensatory and punitive damages totaling four-million dollars.  ECF 28 at 47.

## B.    Non-Dispositive Motions

### 1.    Motion to Seal

Defendants have moved to seal Kindle's medical records and the video surveillance footage of the housing unit where and when the assault took place. ECF 30. They state that disclosure of the video to Kindle, or placing it on the public docket, presents a threat to the security of the prison as it would reveal the location of the security cameras as well as any blind spots that the camera does not capture. They cite several Maryland regulations ("COMAR") provisions which prohibit disclosure of video recordings to inmates and to the provision of the Maryland Public Information Act that prohibits disclosure of any material that would jeopardize the security of any building or endanger any life or safety of another.  *Id*. at 2-3, citing COMAR 12.03.01.19L(3)(f), (6); 19N(2), and 19M(3)(b); Md. Code Ann., Gen. Prov. §§ 4-351, 4-352.

Kindle objects to the motion to seal as it applies to the video surveillance recording and notes that the cameras in the housing units are not hidden, so every inmate knows where they are and knows where the blind spots are. He further argues that this federal civil rights case should not be governed by regulations pertaining to prison disciplinary hearings.  ECF 37.

With regard to Kindle's medical records, Defendants admit that the Kindle has already placed his medical records on the docket without seal but state they are moving to seal the records "out of caution."  ECF 30 at 3.  This Court has taken steps to redact Kindle's personal identifying information from the records he filed.  ECF 46, 47, 48.

Local Rule 105.11 (D. Md. 2023), which governs the sealing of all documents filed in the record, states in relevant part: "[a]ny motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." The Rule balances the public's common law right to inspect and copy judicial records and documents, *see Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597 (1978), with competing interests that sometimes outweigh the public's right, *see In re Knight Publ'g Co*., 743 F.2d 231, 235 (4th Cir. 1984). The common-law presumptive right of access can only be rebutted by showing that countervailing interests heavily outweigh the public interest in access.  *Doe v. Public Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014).  The public's right of access to dispositive motions and the exhibits filed within is protected to an even higher standard by the First Amendment.  *See Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249, 253 (4th Cir. 1988).  This right also "extends to a judicial opinion ruling on a summary judgment motion." *Public Citizen*, 749 F.3d at 267.  The First Amendment's right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly

tailored to serve that interest.'"   *Id.* at 266 (citation omitted). "[S]ensitive medical or personal identification information may be sealed," but not where "the scope of [the] request is too broad." *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011).

To the extent that Defendants seek to rely on the video surveillance recording without providing Kindle with an opportunity to view the video, they are attempting to introduce *ex parte* material to the Court.[2]  For purposes of this opinion, the video will not be considered by the Court. After Kindle is appointed counsel, Defendants will produce a copy of the video to appointed counsel for review. Until such time as appointed counsel has an opportunity to review the video and present argument to the Court regarding whether it meets the standard for sealing, the video shall remain under seal. The motion to seal is denied as to Kindle's medical records, as the motion is unsupported by any cognizable reason for sealing given Kindle's decision to make the records public.

### 2.      Motions regarding mail and potential witness

Kindle filed two emergency motions stating that he was transferred to WCI just before the deadline for opposing Defendants' dispositive motion and his legal mail was improperly withheld from being sent out to this Court.  ECF Nos. 35 and 36.  Kindle claims he was transferred in an effort to keep him from accessing the necessary materials for his Opposition Response.  ECF 35. He further claims that even though he is indigent, the mail room declined to send his legal mail out without payment for postage.  ECF 36.  Kindle's Opposition Response was received by the Court on June 29, 2023, but was improperly docketed as a Response in Opposition only to the motion to seal.  ECF 37.  Thus, the emergency motions shall be denied as moot.

---

[2]      Kindle's objection to the motion to seal is also grounded in Fed. R. Civ. P. 56(d), which shall be addressed below.

Kindle also filed a motion seeking permission to file new evidence and requesting that the name of his potential witness be filed under seal due to the risk of retaliation against his witness. ECF 44. Kindle's intention to call a certain member of correctional staff as a witness and the description of the testimony he expects to elicit from that witness will be considered as part of his Opposition Response. The name of the witness will remain under seal until this case enters discovery and just cause to remove the seal from the pleading has been shown.

### STANDARD OF REVIEW

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd sub nom. Kensington Vol. Fire Dept. Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462 (4th Cir. 2012).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the

court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d 253, 261 (4th Cir. 1998).

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). Here, this Court declines to exercise discretion to treat this motion as one for summary judgment, given the collective circumstances presented by Kindle's *pro se* status, this Court's decision to appoint counsel, and the fact that critical evidence, namely the video of the incident, has not been made available for Kindle to view. The motion will be treated as a motion to dismiss.

## DISCUSSION

### A.    Official Capacity Claims

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id*., citing *Florida Dept of Health & Rehab. Servs. v. Fla. Nursing Home Assn.,* 450 U.S. 147 (1981) (*per curiam*). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's

constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst State School & Hosp.*, 465 U.S. at 100 (emphasis in original). To the extent that Kindle is suing any or all of the defendants in their official capacity, those claims are dismissed.

**B.      Exhaustion of Administrative Remedies**

Defendants assert that Kindle failed to exhaust administrative remedies with regard to his "post-incident housing claim." ECF 29-1 at 11. Kindle claims that when he was brought back to NBCI after his stay in the infirmary at WCI, he was placed on administrative segregation status, requiring his being restrained any time he left his cell. ECF 28 at 28. He further claims that the same inmates who were a threat to him before the assault were still on the tier where he was returned. *Id*.

Failure to exhaust administrative remedies is an affirmative defense. If Kindle's claim regarding his housing assignment was not properly presented through the administrative remedy procedure, it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).

In Maryland prisons, the Administrative Remedy Procedure is the administrative process that must be exhausted. Md. Code Regs. § 12.02.28.02(B)(1), (D) (2018). First, a prisoner must file an ARP with the warden within 30 days of the incident at issue. Md. Code Regs. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); Md. Code Regs. § 12.02.28.09(B) (setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. Md. Code Regs. § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). *See* Md. Code. Ann., Corr. Servs. §§ 10-206, 10-210; Md. Code Regs. § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. *See* Md. Code Ann., Corr. Servs. § 10-210(a). The ARP process does not apply to case management decisions, which are to be directly grieved to the IGO. COMAR 12.02.28.04(B)(1); 12.07.01.04(B)(9)(c).

Kindle has provided a copy of a letter he sent to Warden Nines that complains, in part, about being placed "in the same bloody contaminated cell I was in when I was attacked." ECF 37-4 at 4-5. The letter does not include a complaint about being on the same tier as his assailants. *Id.* Kindle claims he never received a response to his letter from the warden. *Id.*

To satisfy the exhaustion requirement under the PLRA, inmates must comply with the procedures in place. *Moore v. Bennette*, 517 F.3d 717, 725 and 729 (4th Cir. 2008) *see Langford*

14

*v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Kindle has not adequately disputed the assertion that he failed to exhaust his claim regarding the cell assignment he received following his discharge from the infirmary. While his letter to Warden Nines is comprehensive and implies that his assignment to the same cell was improper, Kindle does not include any allegation that his safety was jeopardized by the housing assignment. Moreover, Kindle does not provide evidence that he attempted to file a complaint with the Inmate Grievance Office regarding the case management decision to place him on administrative segregation in the same housing unit he was in before the assault. Accordingly, Kindle's claim regarding his cell assignment must be dismissed without prejudice.

## C.    Failure to Protect from Harm

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to

guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).   A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established.   *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014).   The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834.   Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837.   A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Taking the facts alleged in Kindle's Amended Complaint as true, he has adequately alleged a claim for failure to protect him from a substantial risk of serious harm. Kindle alleges that the housing unit where the incident occurred had in place certain security restrictions that Lease and

Growden did not observe. Kindle asserts that the threat on his life by the Bloods gang and the active disputes between the gangs were well-known and documented. Kindle claims that there are officers at NBCI that accommodate assaults between inmates which then become a topic of discussion among the officers afterward. Kindle alleges that the correctional officer unlocking the door to his cell failed to take reasonable steps to prevent unauthorized hostile inmates from entering and then failed to react promptly when they did enter. And Kindle describes serious injuries resulting from the assault. In totality, those allegations suffice to state a viable claim.

**D.      Medical claims**

Kindle claims that Defendants did not call 911 when it became obvious he was seriously injured; that he was not provided adequate pain relief after he was discharged from the hospital to the WCI infirmary; and that the lack of adequate pain management care has continued.

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834-7; *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Kindle's condition immediately following the assault constituted a serious medical need as it was obvious from even a cursory view that medical care was required. *See* ECF 29-3 at 42-43 (photographs of Kindle's injuries). The issue here is whether these Defendants responded reasonably in light of Kindle's obvious need for medical care.

A successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

In light of the allegations in the Amended Complaint, Kindle has alleged no factual basis to hold these defendants liable for pain management decisions upon his return from the hospital. His claims will be dismissed to that extent.  His claim survives the motion to dismiss, however, as to the allegations that Lease, Growden, and Crites acted with deliberate indifference to a serious medical need by failing to call 911 in a prompt manner given the degree of his visible injuries.

**E.    Supervisory Liability**

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation.  *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff.  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor had actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *Id.* (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Kindle claims that Crites and Iser were responsible for overseeing the housing unit and ensuring that security safeguards were observed.  While Defendants contest those allegations on their merits, the claims meet the low bar required to survive at the motion to dismiss stage.

**F.      Qualified Immunity**

Defendants' qualified immunity defense is unavailing at this stage of the litigation, because Kindle has alleged facts suggesting that the constitutional right was well-established at the time of the incidents at issue and that conduct allegedly violative of plaintiff's constitutional rights actually occurred. *See Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005).  Defendants are of course free to reassert the defense at subsequent stages of the proceedings.

**G.      State law claims**

Defendants have provided an affidavit from the director of the Insurance Division of the Maryland State Treasurer's Office, Joyce Miller.  ECF 29-15.  Ms. Miller confirms that Kindle has not filed a notice of claim pursuant to the Maryland Tort Claims Act.  *Id.*  The filing of such a claim is a prerequisite to pursuing a State claim of negligence against a State employee under Md. Code Ann., State Gov't § 12-106.  Kindle does not dispute this allegation.  Thus, to the extent that Kindle raises a state tort claim, then, it must be dismissed without prejudice.

**CONCLUSION**

By separate order which follows, the Court DENIES in part and GRANTS in part Defendants' motion to dismiss, or in the alternative, for summary judgment and motion to seal. Kindle's motion to amend the complaint and emergency motions regarding mail shall be DENIED as moot and his motion to seal shall be GRANTED.  This Court's November 8, 2022 Order denying Kindle's Motion to Appoint Counsel without prejudice shall be vacated and the motion shall be GRANTED.

March 5, 2024                                                   _____/s/_____
Date                                                           Stephanie A. Gallagher
                                                               United States District Judge